No. 23-5345
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY
*Plaintiff*

and

KENTUCKY CHAMBER OF COMMERCE; U.S. CHAMBER OF COMMERCE;
ASSOCIATED GENERAL CONTRACTORS OF KENTUCKY, INC.; HOME BUILDERS
ASSOCIATION OF KENTUCKY; PORTLAND CEMENT ASSOCIATION; GEORGIA
CHAMBER OF COMMERCE
*Plaintiffs - Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; UNITED STATES
ARMY CORPS OF ENGINEERS; MICHAEL S. REGAN, Official Capacity as Administrator
of the United States Environmental Agency; LIEUTENANT GENERAL SCOTT A.
SPELLMAN, Official Capacity as Chief of Engineers and Commanding General, U.S. Army
Corp of Engineers; MICHAEL L. CONNER, Official Capacity as Assistant Secretary of the
Army (Civil Works)
*Defendants - Appellees*

_____

# APPELLANTS' REPLY IN SUPPORT OF MOTION
# FOR AN INJUNCTION PENDING APPEAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................... ii

INTRODUCTION ................................................................ 1

ARGUMENT ..................................................................... 2

I.      Appellants are likely to succeed on the merits of their appeal. ........................ 2

    A.      The Agencies effectively concede the district court erred in dismissing sua sponte. ................................................ 2

    B.      The Agencies fail to rebut Appellants' standing. ................... 2

        1.      The Agencies offer no response to *Yellen* or Appellants' arguments on compliance costs. ................................ 2

        2.      The Agencies' claim that the Rule does nothing new is false. ............................................................. 5

        3.      The Agencies misrepresent the Rule's revocation of approved jurisdictional determinations. ....................... 6

    C.      The Agencies' defense of the Rule is unavailing. ................... 7

        1.      The Rule reads "navigable" out of the statute. ............... 7

        2.      The Rule is inconsistent with Justice Kennedy's opinion in *Rapanos*. ............................................. 8

        3.      The Rule violates notice-and-comment requirements. ....... 9

        4.      The Rule's expansion of jurisdiction exceeds the Agencies' statutory authority and is arbitrary and capricious. ......................................................... 10

II.     Appellants will suffer irreparable harm absent an injunction. .................... 11

III.    The balance of equities and public interest support an injunction. .............. 11

IV.     The injunction should protect all Appellants and their members ................ 11

CONCLUSION ................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. Philip Randolph Inst. v. Husted*,
  907 F.3d 913 (6th Cir. 2018) ................................................................2

*Chase Bank USA, N.A. v. City of Cleveland*,
  695 F.3d 548 (6th Cir. 2012) ...............................................................2

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) .........................................................12

*Horsehead Res. Dev. Co. v. Browner*,
  16 F.3d 1246 (D.C. Cir. 1994)...........................................................10

*Kentucky v. Yellen*,
  54 F.4th 325 (6th Cir. 2022) ...................................................1, 2, 3, 4

*Mays v. LaRose*,
  951 F.3d 775 (6th Cir. 2020) .............................................................12

*National Ass'n of Manufacturers v. Department of Defense*,
  138 S. Ct. 617 (2018)............................................................................4

*National Cable & Telecommunications Ass'n v. Brand X Internet Services.*,
  545 U.S. 967 (2005).............................................................................8

*Rapanos v. United States*,
  547 U.S. 715 (2006)..........................................................................8, 9

*Small Refiner Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (D.C. Cir. 1983)............................................................9

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001).................................................................7, 10, 11

*Thomas v. Speedway SuperAmerica, LLC*,
  506 F.3d 496 (6th Cir. 2007) .............................................................12

i

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)...........................................................................3

*West Virginia v. EPA*,
    No. 3:23-cv-032, 2023 WL 2914389 (D.N.D. Apr. 12, 2023)...........11

**Statutes**

33 U.S.C. § 1313(a)(1)....................................................................................7

33 U.S.C. § 1362(7) ........................................................................................7

**Other Authorities**

33 C.F.R. § 328.3(a)(5) ..................................................................................6

33 C.F.R. § 328.3(c)(6) ..................................................................................6

33 C.F.R. § 328.3(c)(6)(i), (ii) .......................................................................6

85 Fed. Reg. 22250 (Apr. 21, 2020) ..............................................................8

88 Fed. Reg. 3004 (Jan. 18, 2023) ...........................................................*passim*

# INTRODUCTION

Only an injunction pending appeal can protect Appellant Associations and their members from the Rule's irreparable harm during this appeal.[1] Until the administrative stay, Appellants' members were obliged to comply with the Rule and were incurring costs to stave off the prospect of enforcement, just as in *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022). Those unrecoverable costs were (and are) injury sufficient for both standing and irreparable harm under this Court's precedents.

In response, the Appellee Agencies ("the Agencies") stick their heads in the sand. They assert the costs are not for "compliance," but do not engage with Appellants' arguments on that issue. They do not even cite *Yellen*. Nor do they mention anywhere the Rule's role in defining the Clean Water Act ("CWA") prohibition on discharges, or even acknowledge that underlying prohibition and the serious penalties for violating it.

The Agencies fare no better at defending the Rule itself. Two courts have preliminarily enjoined the Rule in 26 states, citing arguments advanced by Appellants. What do the Agencies say about those cases? Just a footnote.

As for the balance of equities and public interest, the Agencies were called out by this Court and again failed to answer. In granting the administrative stay, this

---

[1] Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004 (Jan. 18, 2023) ("Rule").

Court noted that "the government ha[d] not identified any particular interest in immediate enforcement of the final rule." Order at 2 (ECF 12-1). They still haven't. Most revealing, the Agencies have not appealed, much less sought to stay, either of the injunctions that were issued weeks ago.

## ARGUMENT

Nothing in the Opposition (ECF 22) rebuts Appellants' showing on all four factors for an injunction pending appeal. The Agencies suggest (at 7) that a "higher justification" is required here. But in *A. Philip Randolph Inst. v. Husted*, 907 F.3d 913 (6th Cir. 2018), this Court rejected that argument.

## I. Appellants are likely to succeed on the merits of their appeal.

### A. The Agencies effectively concede the district court erred in dismissing *sua sponte*.

The district court failed to comply with *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548 (6th Cir. 2012). The Agencies do not acknowledge *Chase Bank*, much less identify where the court gave the required notice. Opp. 10 n.4.

### B. The Agencies fail to rebut Appellants' standing.

#### 1. The Agencies offer no response to *Yellen* or Appellants' arguments on compliance costs.

As discussed in the Motion (ECF 9 at 10–11), Appellants have standing under *Yellen*, which holds that costs to "maintain compliance" with changed regulatory "proscriptions" and thereby "stave off" the prospect of enforcement are "recognized harm for purposes of Article III." 54 F.4th at 342–43. The Rule is just such a change,

as it expands the scope of the CWA's proscription on discharges to navigable waters. And as a result, those with projects likely to affect such waters have had to incur costs to conform their conduct or face serious penalties for non-compliance, as in *Yellen*. That includes Appellants' members.

The district court wrongly dismissed these costs as going to the "preliminary question" of "whether one needs to comply with [the] regulation." Mot. A18–A19. Just as in *Yellen*, no one here needs to ask whether the Rule presently governs their behavior. That might be a threshold question for someone with no actual plans to do anything to waters or wetlands. But because they have ongoing or planned projects that will likely affect jurisdictional waters or wetlands, Appellants' declarants come within the Rule's ambit and must abide by its new delineation of what is or is not a lawful discharge. That is how prohibitions on conduct work.

The identified costs—the delay and expense of assessing whether the jurisdictional status of waters and wetlands in ongoing or planned projects has changed—go to *complying* with the law. Why else would the Supreme Court emphasize repeatedly that "it can be difficult to determine whether a particular parcel of property contains [jurisdictional] waters"? *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 594 (2016). That analysis is *necessary* to ensuring one's ongoing or planned conduct does not violate the law.

The Agencies' only answer is to insist the district court was right. They assert (at 23) that the Rule "does not act upon Plaintiffs directly," and parrot (at 9) the district court's reasoning that "[r]eading a rule and determining its application is neither a 'compliance cost' nor an Article III injury."

But *nowhere* do the Agencies engage Appellants' arguments that their members are not determining whether the Rule applies, but forced to conform their conduct to it. The Agencies do not even cite *Yellen*. They never once acknowledge that the Rule defines the scope of a statutory prohibition or the serious civil and criminal penalties for non-compliance. And they give no response to the Supreme Court's focus on the necessity and difficulty of determining a water's jurisdictional status.

This head-in-the-sand approach is unsurprising, given the Agencies once admitted to the Supreme Court that a rule like this one "imposes restrictions on the activities of property owners." Mot. 12. Or as they told this Court, the Rule "governs the[] [public's] conduct." Mot. to Clarify 2, ECF 14. They ignore *Yellen* because they have no answer to it.

Nor do the Agencies meaningfully respond to the fact that the district court's ruling forecloses facial pre-enforcement challenges by a private entity to a rule like this. Mot. 14. They blithely accept that practical consequence, ignoring that *National*

*Ass'n of Manufacturers v. Department of Defense*, 138 S. Ct. 617 (2018), specifically decided where such a suit must be brought.

It bears repeating: *No* court had ever "dismissed a case [challenging a 'waters of the United States' rule] for the district court's reasons." Mot. 14–15. The Agencies point (at 10) to *Colorado v. EPA*, but that case turned on a "tenuous" claim that "environmental harm would likely occur if federal protections are withdrawn." 989 F.3d 874, 889 (10th Cir. 2021).[2]

### 2.    The Agencies' claim that the Rule does nothing new is false.

The Agencies argue that the Rule does nothing new anyway, Opp. 9–10, and even narrows their jurisdiction, *id.* at 6 (table). That is wrong.

First, comparing the Rule with the 1986 Regulations is disingenuous at best. As the Rule itself acknowledges, 88 Fed. Reg. at 3047, 3102–03, its status quo is the pre-2015 regime, which consists of the 1986 Regulations *as interpreted by the Rapanos Guidance*.

Second, when compared against that regime, the Rule makes substantial changes, including:

- creating a jurisdictional test for intrastate waters over which "the [A]gencies have not in practice asserted jurisdiction," *id.* at 3102–03;

---

[2] Absent a stay, the compliance costs imposed on Appellants' members are also a hardship that makes this case prudentially ripe. *Contra* Opp. 12.

- applying a significant nexus test to these waters, 33 C.F.R. § 328.3(a)(5);

- expanding "in the region" from "all wetlands adjacent to the same tributary," Mot. A55, to all "waters . . . within the catchment area of the tributary of interest," 88 Fed. Reg. at 3097;

- redefining "significantly affect" to mean "material influence," 33 C.F.R. § 328.3(c)(6);

- changing "chemical, physical *and* biological integrity," Mot. A48 (emphasis added), to "chemical, physical, *or* biological integrity," 33 C.F.R. § 328.3(c)(6) (emphasis added); and

- adopting novel "[f]unctions" and "[f]actors" in the Rule's significant nexus test, 33 C.F.R. § 328.3(c)(6)(i), (ii).

### 3.  The Agencies misrepresent the Rule's revocation of approved jurisdictional determinations.

Appellants independently have standing because the Rule revokes approved jurisdictional determinations made under the Navigable Waters Protection Rule ("NWPR"). Mot. 17 & A47. The Agencies respond (at 13) that the Rule "does not invalidate [jurisdictional determinations] issued under prior definitions." But the Rule says that "[a]ny existing AJD—*except AJDs issued under the vacated 2020 NWPR, which are discussed below—will remain valid.*" 88 Fed. Reg. at 3136

6

(emphasis added). Subject to limited exceptions, those AJDs "will not be relied upon by the Corps." *Id.*

### C.    The Agencies' defense of the Rule is unavailing.

#### 1.    The Rule reads "navigable" out of the statute.

Several courts have concluded that asserting authority over all "interstate waters, regardless of their navigability"—as the Rule does—is inconsistent with the Supreme Court's instruction that the statutory term "navigable" be given "effect." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001) ("*SWANCC*"); *see* Mot. 18.

The Agencies respond (at 14–15) that *SWANCC*'s mandate applies only to "intrastate waters" and that "interstate waters" are "clearly" federal. But *SWANCC* held that Congress did not invoke its full constitutional authority in the CWA, and instead used "navigable" to require a connection to "waters that were or had been navigable in fact or which could reasonably be so made." 531 U.S. at 171–72. The Agencies' other cases (at 15) all precede *SWANCC* and did not address the meaning of "navigable waters" or "waters of the United States."

The Agencies also contend (at 15) that a different provision of the CWA (33 U.S.C. § 1313(a)(1)) and the CWA's predecessor "expressly reference[]" "interstate waters." But that makes Congress's decision *not* to include the phrase in the definition of "navigable waters" (33 U.S.C. § 1362(7)) even more meaningful.

Indeed, in the 2020 NWPR, the Agencies *rejected* the argument they are making now. 85 Fed. Reg. 22250, 22283 (Apr. 21, 2020).

### 2.    The Rule is inconsistent with Justice Kennedy's opinion in *Rapanos*.

Regarding Justice Kennedy's opinion, the Agencies assert (at 16) that they need not follow *Rapanos*, citing *National Cable & Telecommunications Ass'n v. Brand X Internet Services.*, 545 U.S. 967 (2005). Not so. *Brand X* provides that an agency's reasonable interpretation of *ambiguous* statutory language is entitled to deference even if contrary to a prior court's different take on that same language. *Id.* at 982. But both the plurality and the concurrence in *Rapanos* viewed themselves as setting outer limits on the statute's meaning. Thus, the plurality said its reading is the "only plausible interpretation." *Rapanos v. United States*, 547 U.S. 715, 739 (2006) (plurality op.). And Justice Kennedy indicated that "the need to give the term 'navigable' some meaning" *limited* "[t]he deference owed to the Corps[]" and required adopting his significant nexus test. 547 U.S. at 778–79 (Kennedy, J., concurring).

Nor have the Agencies harmonized the Rule with Justice Kennedy's opinion. First, they do not explain how aggregating waters fits with his rejection of jurisdiction over wetlands whose "effects on water quality are speculative or insubstantial." *Id.* at 780. They quote (at 17) his phrase "either alone or in combination with similarly situated lands in the region." In context, however, it is

clear Justice Kennedy was not green-lighting jurisdiction en masse, but rather leaving open that "[w]here an adequate nexus is established for a particular wetland, it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region." 547 U.S. at 782 (Kennedy, J., concurring).

Second, the Agencies claim (at 17) that "nothing in Justice Kennedy's opinion" limited his test to adjacent wetlands. But his reasoning turned on the functions that wetlands specifically perform "related to the integrity of other waters." 547 U.S. at 779 (Kennedy, J., concurring). And his holding is stated entirely in terms of wetlands. *Id.* at 780.

Third, the Agencies simply ignore the inconsistency between the Rule's allowing a significant nexus based on "[c]ontribution of flow," and Justice Kennedy's specifically rejecting the notion that "[t]he merest trickle, if continuous" could establish a significant nexus. Mot. 18–19.

### 3.     The Rule violates notice-and-comment requirements.

The Agencies also cannot dodge the logical-outgrowth doctrine. Despite their claim (at 21) that the final definition of "significantly affect" is "similar" to that initially proposed, the two are quite different and thus required the Agencies to "describe the range of alternatives" in their proposal. *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). They did not. The

Agencies also argue (at 21) that comments were submitted anyway. But "notice is the agency's duty" and "must come—if at all—from the Agency.'" *Horsehead Res. Dev. Co. v. Browner*, 16 F.3d 1246, 1268 (D.C. Cir. 1994).

### 4.    The Rule's expansion of jurisdiction exceeds the Agencies' statutory authority and is arbitrary and capricious.

Finally, the Agencies unsuccessfully counter Appellants' arguments (at 19–21) regarding the Rule's breadth.

First, the Agencies wrongly claim (at 15) that paragraph (a)(5) does not introduce new waters. They are correct that the paragraph tracks what were called "paragraph (a)(3) 'other waters'" under the 1986 Regulations. But they leave out the Rule's acknowledgment that "the [A]gencies have not in practice asserted jurisdiction over paragraph (a)(3) 'other waters' under the pre-2015 regulatory regime." 88 Fed. Reg. at 3103.

Second, the Agencies say their "economic analysis" shows the Rule will have little effect. But their estimates are extrapolated from past practice that, by their own admission, did not concern (a)(5) waters or "catchment areas." A5–A6. So that is an unreliable guide to what will happen once the Agencies start evaluating these features and areas.

Third, the Agencies contend (at 20) that, in any event, the Rule does not raise federalism concerns under *SWANCC* because it "ensure[s] the requisite connection between non-navigable intrastate waters and the channels of commerce." But

*SWANCC* requires a connection to *navigability*, not merely the channels of commerce. And the Agencies' malleable significant nexus test does not establish a sufficient "connection" to either anyway.

## II.     Appellants will suffer irreparable harm absent an injunction.

The Agencies do not dispute that unrecoverable compliance costs are always irreparable harm. Instead, they assert again (at 22–23) that the Rule does not impose such costs. As discussed, that is wrong. *Supra* I.B.1.

## III.    The balance of equities and public interest support an injunction.

In word and deed, the Agencies have admitted they won't be harmed by an injunction. They contend that the Rule makes only "minor, unquantifiable" changes from the status quo. And they have not sought to stay or appeal either preliminary injunction.

Regarding the public interest, the Agencies claim (at 21) that the Rule will "increas[e] efficiency and clarity." But "[c]ommon sense would lead any reasonable person to reach a far different conclusion," especially with the pending Supreme Court decision in *Sackett*. *West Virginia v. EPA*, No. 3:23-cv-032, 2023 WL 2914389, at *23–26 (D.N.D. Apr. 12, 2023).

## IV.    The injunction should protect all Appellants and their members.

In closing, the Agencies do not contest that any temporary relief should protect Appellants and their members, but as an afterthought, suggest the Court entertain two limitations. These suggestions are too "perfunctory" to be considered.

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500 n.1 (6th Cir. 2007). In any event, they lack merit. The Agencies first suggest the injunction should protect only those Appellants who submitted member declarations. But at this stage and in this posture, it is settled that only one party must demonstrate standing. *Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020). Next, they suggest the injunction should be expressly limited to "existing" members. But there is no precedent for such a limitation, which could raise freedom of association concerns.[3]

## CONCLUSION

This Court should enjoin the Agencies from enforcing the Rule against Appellants and their members pending appeal.

---

[3] The Eleventh Circuit recently affirmed an injunction for the "members of Associated Builders and Contractors," without any such limitation. *Georgia v. President of the United States*, 46 F.4th 1283, 1307 (11th Cir. 2022).

Dated: May 5, 2023                    /s/ Elbert Lin
                                      Elbert Lin
                                      Hunton Andrews Kurth LLP
                                      951 East Byrd Street, East Tower
                                      Richmond, VA 23219
                                      (804) 788-8200
                                      elin@Hunton.com

                                      Matthew Z. Leopold
                                      Kerry L. McGrath
                                      Erica N. Peterson
                                      Hunton Andrews Kurth LLP
                                      2200 Pennsylvania Avenue, NW
                                      Washington, DC 20037
                                      (202) 955-1500
                                      mleopold@HuntonAK.com
                                      kmcgrath@HuntonAK.com
                                      epeterson@Hunton.com

                                      Charles E. English, Jr. ("Buzz")
                                      Sarah P. Jarboe
                                      LaJuana S. Wilcher
                                      English, Lucas, Priest & Owsley, LLP
                                      1101 College Street; P.O. Box 770
                                      Bowling Green, KY 42102-0770
                                      (270) 781-6500
                                      benglish@elpolaw.com
                                      sjarboe@elpolaw.com
                                      lwilcher@elpolaw.com

                                      *Counsel for Plaintiffs Kentucky Chamber of
                                      Commerce, Chamber of Commerce of the
                                      United States of America, Associated
                                      General Contractors of Kentucky, Inc.,
                                      Home Builders Association of Kentucky,
                                      Portland Cement Association, and Georgia
                                      Chamber of Commerce*

                                      Tara S. Morrissey
                                      Andrew R. Varcoe

                                      13

Stephanie A. Maloney
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
(202) 463-5337
tmorrissey@USChamber.com
avarcoe@USChamber.com
smaloney@USChamber.com

*Counsel for Plaintiff Chamber of Commerce
of the United States of America*

14

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing Reply complies with the length limitation of Rule 27(d)(2)(C) of the Federal Rules of Appellate Procedure because it contains 2,591 words. This motion also complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the typestyle requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Elbert Lin

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 5th day of May 2023, I filed a copy of the above document with the Court's electronic-filing system, which will send an electronic copy to all counsel.

/s/ Elbert Lin

# ADDENDUM

# TABLE OF CONTENTS

U.S. Envtl. Prot. Agency & Dep't of the Army, Economic Analysis
for the Final "Revised Definition of 'Waters of the United
States'" Rule (Dec. 2022) (excerpt) ...........................................................A1





# Economic Analysis for the Final "Revised Definition of 'Waters of the United States'" Rule

U.S. Environmental Protection Agency

and

Department of the Army

December 2022

# Table of Contents

**Table of Contents** ........................................................................................................ ii

**List of Tables** ............................................................................................................... v

**List of Figures** ............................................................................................................ vii

**Abbreviations** ............................................................................................................ viii

**Executive Summary** ..................................................................................................... xi

**I.**     **Introduction and Overview** ............................................................................ 1

I.A    Overview of Economic Analysis ....................................................................... 2

I.B    Summary of the Final Changes in Clean Water Act Jurisdiction Relative to the Secondary Baseline ................................................................................................................ 4

        I.B.1  The Pre-2015 Regulatory Regime Baseline ............................................ 4

        I.B.2  The 2020 NWPR Baseline ....................................................................... 6

        I.B.3  The Final Rule and How It Compares to Prior Regimes ......................... 9

        I.B.4  Comparison of the Scope of Jurisdiction: Primary Baseline and Final Rule ...... 36

        I.B.5  Comparison of Scope of Jurisdiction: Secondary Baseline and Final Rule .......... 37

I.C    Assessing the Change in Scope of Jurisdiction with the Cowardin Classification .......... 38

        I.C.1  Prior Methods for Assessing Change in Scope .................................... 38

        I.C.2  Assessing Change in Scope between Pre-2015 Practice and the 2020 NWPR ........ 39

I.D    Economic Analysis of the Final Rule using the Primary Baseline ............................ 39

        I.D.1  Unfunded Mandate Reform Act ............................................................ 39

        I.D.2  Executive Order 12898 Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations .......................................... 40

        I.D.3  Executive Orders 12866 Regulatory Planning and Review and 13563 Improving Regulation and Regulatory Review ................................................. 40

        I.D.4  Regulatory Flexibility Act and Small Business Regulatory Enforcement Fairness Act ........ 40

I.E    I.E. Summary ............................................................................................... 42

**II.**    **State and Tribal Regulatory Practice** ............................................................. 44

II.A    "Waters of the State" ......................................................................................... 46

II.B    State Regulatory Practice ................................................................................... 46

        II.B.1 Regulation of Dredge and Fill Material ........................................... 47

        II.B.2 Surface Water Discharge Permitting ............................................... 48

II.C    Incorporation of State Regulations in Economic Analysis ................................... 49

**III.** **Analysis of the Impacts of Clean Water Act Jurisdictional Changes from the Secondary Baseline (2020 NWPR) to Final Rule** ........................................................................ **51**

III.A   Clean Water Act Section 311: Oil Spill Prevention, Preparedness, Reporting and Response ........ 51

    III.A.1   Spill Prevention and Preparedness ................................................................. 52

    III.A.2   Spill Notification and Removal ...................................................................... 57

    III.A.3   Uncertainty and Limitations for Assessing Potential Effects on Clean Water Act Section 311 Program ............................................................................................... 59

III.B   Clean Water Act Section 402: National Pollutant Discharge Elimination System (NPDES) ......... 60

    III.B.1   Potential Impacts on Individual NPDES Permits ............................................. 62

    III.B.2   Potential Impacts on General Permits ............................................................ 63

    III.B.3   Potential Impacts on Section 402 State Programs ........................................... 66

    III.B.4   Uncertainty and Limitations for Assessing Potential Effects on Clean Water Act Section 402 Program ............................................................................................... 67

III.C   Clean Water Act Section 404: Discharge of Dredged or Fill Material .................................... 67

    III.C.1   Potential Effects of the Final Rule on the Clean Water Act Section 404 Program .......... 70

    III.C.2   Quantitative Assessment of Potential National Impacts .................................... 72

    III.C.3   Uncertainty and Limitations for Assessing Potential Effects on Clean Water Act Section 404 Program ............................................................................................... 90

III.D   Other Clean Water Act Sections .......................................................................... 94

    III.D.1   Clean Water Act Section 303: Water Quality Standards and Total Maximum Daily Loads 94

    III.D.2   Clean Water Act Section 401: State and Tribal Roles ....................................... 95

**IV.**   **Environmental Justice Analysis** ................................................................. **96**

IV.A   Screening Analysis of the Final Rule using the Secondary Baseline of the 2020 NWPR .............. 96

IV.B   Uncertainty and Limitations ............................................................................. 113

**V.**   **Tribal Impact Analysis** ............................................................................. **114**

**VI.**   **Sector Impact Analysis** ............................................................................ **119**

**VII.**   **References** ............................................................................................. **123**

**Appendix A**   **Using Cowardin Classification to Assess Change in Jurisdictional Scope** ............... **130**

**Appendix B**   **Methodology for Generating Benefit-Transfer Predictions based on Wetland Meta-Analysis 134**

B.1.   Meta-data .................................................................................................. 135

B.2.   Regression Results ....................................................................................... 137

B.3.   WTP prediction ........................................................................................... 142

**Appendix C**    **Final Rule Analysis: State-level Results** ............................................................ **152**

**Appendix D**    **Sensitivity Analysis of National Benefits** ................................................. **167**

**Appendix E**    **Mapped NHD Stream Mileage and NWI Wetland Acreage by State** ...................... **178**

**Appendix F**    **Environmental Justice Analysis State-level Results** .................................. **183**

**Appendix G**    **Sector Impact Analysis State-level Results** ............................................... **194**

**Appendix H**    **Alternative Permit Cost Estimates using Sunding and Zilberman (2002) Values** .. **212**

be considered jurisdictional paragraph (a)(5) waters. To illustrate, a relatively permanent lake located near a tributary that meets the relatively permanent standard, but separated by a natural berm, to the extent that berm provides evidence of a continuous surface connection, is jurisdictional as a paragraph (a)(5) water under the relatively permanent standard. Similarly, a relatively permanent oxbow pond located near a traditional navigable water, and connected to that traditional navigable water via a swale that provides a continuous surface connection between the pond and the traditional navigable water, is jurisdictional as a paragraph (a)(5) water under the relatively permanent standard. Wetlands with similar characteristics are considered for jurisdiction under the final rule as adjacent wetlands. When an intrastate lake, pond, stream or wetland that does not meet the jurisdictional criteria under other categories of the final rule does not have a continuous surface connection, regardless of flow regime, it would be assessed as a paragraph (a)(5) water via a significant nexus analysis. Some waters could be considered jurisdictional under paragraph (a)(5) where they significantly affect the chemical, physical, or biological integrity of traditional navigable waters, the territorial seas, or interstate waters, though the agencies anticipate that more resources will likely be found jurisdictional under paragraph (a)(5) pursuant to the relatively permanent standard.

### I.B.3.6.2   Comparison of the Final Rule to the Primary Baseline

The agencies final rule makes changes to the jurisdictional criteria considered for intrastate waters evaluated under paragraph (a)(5) of the final rule as compared to the jurisdictional criteria intrastate waters evaluated under the comparable paragraph (a)(3) of the 1986 regulations, which is utilized under pre-2015 practice. This rule replaces the interstate commerce test used in paragraph (a)(3) of the 1986 regulations with the relatively permanent standard and the significant nexus standard for the comparable paragraph (a)(5) category in this rule. Prior to the *SWANCC* decision, paragraph (a)(3) of the 1986 regulations provided a broad scope of jurisdiction for waters considered under that category. However, after the *SWANCC* decision, as discussed in Section I.B.1, in practice the agencies have not asserted jurisdiction over waters assessed under paragraph (a)(3) of the 1986 regulations. Compared to the straight regulatory text of paragraph (a)(3) of the 1986 regulations, the final rule's analogous paragraph (a)(5) category represents a decrease in jurisdiction for waters considered under that category. However, there will likely be waters that are jurisdictional under paragraph (a)(5) of the final rule that in practice would not have been jurisdictional under the comparable paragraph (a)(3) category of the 1986 regulations as implemented consistent with the pre-2015 regulatory regime. This includes waters evaluated under paragraph (a)(5) pursuant to the relatively permanent standard, as discussed in Section I.B.3.6(1), and waters evaluated under paragraph (a)(5) pursuant to the significant nexus standard. Similar to pre-2015 practice, waters evaluated under paragraph (a)(5) pursuant to the significant nexus standard will generally be considered individually. When considered individually, there are likely few of these resources that would feasibly be found to have a significant nexus. For example, there would be a higher likelihood for the water to be jurisdictional as an (a)(5) water if it were substantially large, and/or in close proximity to the nearest traditional navigable waters, territorial seas, or interstate waters ("paragraph (a)(1) waters").

For example, when looking at data associated with JDs carried out under the *Rapanos* Guidance utilized consistent with pre-2015 practice (including AJDs, PJDs and JD Concurrences), the proportion of waters considered under paragraph (a)(3) of the 1986 regulations which will require an assessment under either the relatively permanent standard or significant nexus standard under the final rule is only 3.64% of all

aquatic resources that underwent jurisdictional determinations.[19] This 3.64% represents intrastate rivers, streams, wetlands, lakes and ponds, and other types of waters that were found to be non-jurisdictional after an evaluation under paragraph (a)(3) of the 1986 regulations under pre-2015 practice. An unknown yet likely small fraction of this 4% could potentially become jurisdictional under this final rule under either the relatively permanent standard or the significant nexus standard.

To delve into this matter more, the agencies reviewed AJD data under the 2015 Clean Water Rule, which provided a very different avenue for finding certain intrastate waters to be jurisdictional. The number of observations from the 2015 Clean Water Rule within ORM2 that could potentially have been comparable to the implementation of paragraph (a)(5) of the final rule was so small that the dataset is not statistically viable for comparison. In short, the number of features to which this applies is too small to use for inferences of change in scope.

### I.B.3.6.3   Comparison of the Final Rule to the Secondary Baseline

Under the 2020 NWPR, most waters that are assessed under paragraph (a)(5) of the final rule would have fallen under the 2020 NWPR's paragraph (b)(1) exclusion for waters not identified in that rule's four categories of "waters of the United States." Some waters evaluated under paragraph (a)(5) of the final rule may have been jurisdictional under the 2020 NWPR's category for "lakes and ponds, and impoundments of jurisdictional waters" (*e.g.*, non-tributary lakes and ponds that are inundated by flooding in a typical year from traditional navigable water, a territorial sea, jurisdictional tributary under the 2020 NWPR, or jurisdictional lake and pond, or impoundment under the 2020 NWPR).

As discussed in previous sections, the agencies have been using data associated with pre-2015 practice to estimate potential changes between the final rule and the 2020 NWPR, but there are also data constraints which prevent a direct comparison of resources the 2020 NWPR found to be jurisdictional compared to what the pre-2015 regulatory practice found jurisdictional for these non-navigable, intrastate waters. Generally speaking, there are likely few resources from pre-2015 regulatory practice that would become jurisdictional under the (a)(5) category under the final rule. The difference in scope of jurisdiction from the primary baseline is expected to be *de minimis*. Applying that forward to the 2020 NWPR, where the differences were also *de minimis*, the agencies believe that overall the changes in jurisdiction related to (a)(5) waters in the final rule in comparison to the 2020 NWPR's approach to non-navigable, isolated, intrastate waters will be *de minimis*.

### I.B.3.6.4   Documentation in ORM2

Under pre-2015 regulatory practice, in ORM2 the water type "Isolate" was used as a catch-all for the (a)(3) "other waters category" under that regime. This water type could be further broken down by Cowardin classification into lacustrine, palustrine, and riverine resources.

Under the 2020 NWPR, most waters that would be evaluated under paragraph (a)(5) of the final rule were captured under the paragraph (b)(1) water type of that rule in ORM2; however, there is no way to differentiate these from other non-jurisdictional features excluded under paragraph (b)(1) of the 2020

---

[19] Date range considered: January 1, 2010 to April 9, 2021.